[No. C038290. Third Dist. Nov. 14, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
J. RICHARD WOOD, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976(b) and 976.1 of the California Rules of Court, this opinion is certified for publication with the exception of parts II through V, inclusive, of the DISCUSSION.

**COUNSEL**

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Janis Shank McLean and Jane N. Kirkland, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SIMS, Acting P. J.**—A jury convicted defendant J. Richard Wood of animal abuse. (Pen. Code, § 597, subd. (b); further undesignated statutory references are to the Penal Code.) Imposition of sentence was suspended and defendant was placed on probation for three years on the conditions, among others, that he serve 180 days of incarceration and forfeit the animal. Defendant appealed.

In the published portion of our opinion, we hold the trial court erred when it allowed an animal control officer to testify, over defendant's Fourth and Fifth Amendment objections, that defendant refused the officer's request to enter his property without a warrant. However, we conclude the error was harmless because the testimony would have been admissible to impeach defendant's testimony that he lacked ownership and control of the property and the animal located thereon.

In the unpublished portion of our opinion, we reject defendant's contentions that the jury instructions on animal cruelty and criminal negligence were incorrect, and that instructions on causation and mistake of fact should have been given sua sponte. We shall therefore affirm the judgment.

FACTS

*Prosecution case-in-chief*

On December 1, 1998, El Dorado County Animal Control Officer John Vail went to an address on Mt. Aukum Road, a rural, hilly and wooded area of the county. In a pasture area near some buildings, Vail saw and photographed a horse that was very thin; its ribs were showing, its hips were angular rather than round, and its backbone was concave instead of convex. There was little, if any, vegetation in the pasture.

Vail approached a building to try to contact someone about the horse. When defendant emerged from the building, Vail advised him that he had received a complaint about the horse and asked permission to look at it more closely. Over defendant's objection, Vail testified that defendant refused, telling Vail he did not want Vail on his property.

Ten days later, Vail returned to the property with a warrant to seize the horse, an Appaloosa named Patches, which was in the same condition as when Vail had seen it before. Vail confirmed that Patches was emaciated; he could feel individual ribs, vertebrae and pelvis points. Patches was in the same area as before with no food available and very little grass, which was too short for grazing; nor was there any debris indicating that Patches had been given food or hay. There was slightly more than one bale of hay in an area that Patches could not access. Patches was apparently just scraping the ground with his lips and teeth for sustenance. Vail seized Patches because of his poor appearance and condition, and the lack of available food.

Vail took Patches to a truck scale and determined that he weighed 930 pounds. The next day Dr. Christine Vos, a veterinarian, examined Patches.

Dr. Vos described Patches as looking worse than the photographs showed. She said he was "significantly" underweight, with his ribs, vertebrae and pelvic bones showing prominently. His muscles were wasting, showing that his body had used all its fat reserves and was feeding on muscle. He also had a significant amount of sand in his abdomen and his manure, which is abnormal, occurring when an animal is eating dirt for some reason. Sand inside a horse can decrease its weight by abrading its intestines and settling in its bowels so that nutrients from food cannot be as readily absorbed and food cannot travel as well through the intestines.

Dr. Vos found that Patches had sharp points on his teeth, which had caused scarring and cuts along his tongue and cheeks; horses' teeth need to be filed down periodically to prevent this condition. In sum, Dr. Vos found that Patches was not healthy "at all"; he was emaciated, in pain from mouth lesions and the internal sand, and suffering needlessly. She opined that Patches was not receiving enough food and not able to properly use the food he did get because of the teeth and sand problems. On the Henneke scale, used for rating horse health, where five is normal, 10 is obese and one is near death, Patches was a two or two plus. It would have taken at least a few weeks for Patches to decline into this unhealthy condition. Left untreated, these maladies would have killed him.

On March 11, 1999, after receiving three months of care, Patches had gained 130 pounds and looked "normal."

Defendant and his former wife, Micki Wood, bought Patches in 1987 or 1988. While they were together, Wood cared for Patches, who had not had emaciation or weight problems. When the couple separated in 1990, defendant received Patches in a partial distribution of their marital property.

*Defense*

Defendant testified on his own behalf. He acknowledged that he obtained ownership and possession of Patches in the divorce. However, he deeded Patches to the Kalashnikoff Trust, from which he had borrowed in order to retain counsel for the divorce. Defendant is one of three trustees of the Kalashnikoff Trust, which his aunt had established.

The Mt. Aukum Road property where Patches was pastured was owned by an unrelated investors' trust, which obtained the property by foreclosure when defendant and his wife failed to keep up the payments after the divorce.

Defendant lived primarily in Utah. He left Patches in the care of a caretaker responsible to the Kalashnikoff Trust, which rented the real property from the investors' trust. While defendant had responsibility for Patches

and ordered the feed, it was the caretaker who actually fed Patches. When defendant was on the property on December 1, 1998, he saw the one bale of hay that was inaccessible to Patches. He ordered more feed, but he did not see that Patches was in any danger. The photographs taken on December 1 were "[n]ot at all" what Patches looked like that day. No ribs or other bones were showing or protruding. Defendant did not recall when, prior to December 1, 1998, he had last checked Patches's teeth.

Defendant hired veterinarian Dr. Dean Bader on behalf of the Kalashnikoff Trust to examine Patches after the animal control officer seized him. Dr. Bader examined Patches on December 17, 1998, and on March 11, 1999. Dr. Bader agreed with Dr. Vos's conclusion that Patches was in "poor" condition in December 1998, but nevertheless claimed that Patches was "healthy" and "wasn't sick."

Dr. Bader did not recall whether he checked for sand. He noted that sand was harmful to horses because it irritates their bowels and interferes with absorption of nutrients. The amount of sand Dr. Vos had found in Patches could have caused him some problems, including weight loss.

When Dr. Bader saw Patches again on March 11, 1999, there was a substantial change for the better. Patches had gained weight and regained some lost muscle; his ribs were no longer prominent or visible.

### DISCUSSION

### I

■ Defendant contends his Fourth and Fifth Amendment rights were violated when the trial court allowed Officer Vail to testify that defendant refused Vail access to the pasture where Patches was kept. We agree that the trial court erred but conclude that the error was harmless.

### Background

Officer Vail testified that during his December 1, 1998, visit to the property (when he did not have a warrant), he told defendant he "had received a complaint about the horse" and asked, "could we go take a look at it." The prosecutor asked Vail, "did [defendant] respond to you." Defense counsel stated, "Objection. Fifth Amendment, Fourth Amendment." The trial court had an off-the-record discussion with both counsel and then directed the prosecutor to "[g]o ahead." The prosecutor re-asked the question. After refreshing his recollection, Vail testified that defendant had stated, "You know better than that. You're not coming on my property."

*Analysis*

Defendant relies primarily on *People v. Keener* (1983) 148 Cal.App.3d 73 [195 Cal.Rptr. 733] (*Keener*). In *Keener*, four SWAT officers testified during the prosecution case-in-chief "to what can only be characterized as a siege of defendant's apartment," including "how they tried to coax Keener out of the apartment" and how he responded. (*Id.* at p. 78.) "Evidence of the siege was offered to show a consciousness of guilt; i.e., if defendant was not guilty he would have immediately surrendered." (*Ibid.*) *Keener* held that admission of evidence of the defendant's refusal to consent to a warrantless entry of his residence violated the privilege to be free from comment upon the assertion of a constitutional right. (*Ibid.*)

*Keener* derived the privilege primarily from three opinions of the United States Supreme Court: *Griffin v. California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106] (*Griffin*), *Doyle v. Ohio* (1976) 426 U.S. 610, 619 [96 S.Ct. 2240, 2245, 49 L.Ed.2d 91] (*Doyle*), and *Jenkins v. Anderson* (1980) 447 U.S. 231 [100 S.Ct. 2124, 65 L.Ed.2d 86] (*Jenkins*). *Griffin* had precluded the prosecution from commenting on the silence of an accused who asserts his right to remain silent during the trial. (*Griffin*, at p. 614 [85 S.Ct. at p. 1233].) *Doyle* had held that the due process clause of the Fourteenth Amendment forbids prosecutors from using a defendant's postarrest, post-*Miranda*[1] silence for impeachment purposes. *Jenkins* had held that *prearrest* silence may be used to impeach the credibility of a defendant who chooses to testify. (*Jenkins, supra*, 447 U.S. at p. 240 [100 S.Ct. at p. 2130].)

*Keener* explained that "Presenting evidence of an individual's exercise of a right to refuse to consent to entry in order to demonstrate a consciousness of guilt merely serves to punish the exercise of the right to insist upon a warrant. It is of no consequence that police had a right to enter without a warrant here, nor does it matter that defendant spoke to the police during the siege. 'The right to refuse [entry] protects both the innocent and the guilty, and to use its exercise against the defendant would be, as the court said in *Griffin*, a penalty imposed by courts for exercising a constitutional right.' (*United States v. Prescott* [(9th Cir. 1978)] 581 F.2d 1343, 1352.)" (*Keener, supra*, 148 Cal.App.3d 73, 79.)

Conclusions similar to *Keener* have been reached in many other jurisdictions that have addressed similar issues. (E.g., *State v. Palenkas* (Ariz.Ct.App. 1996) 933 P.2d 1269, amended Dec. 19, 1996, 1 CA-CR

---

[1]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

95-0752, 1996 Ariz. App. Lexis 267 [prosecutor's use of defendant's contacting his attorney and his invocation of his right to refuse a warrantless search as evidence of his guilt denied due process and required a new trial]; *United States v. Thame* (3d Cir. 1988) 846 F.2d 200, 206 [error for the prosecutor to argue that defendant's refusal to consent to search of his bag constituted evidence of his guilt]; *United States v. Taxe* (9th Cir. 1976) 540 F.2d 961 [prosecutor's comments on defendants' refusal to consent to a search of their trucks was "misconduct" but harmless under circumstances]; *U.S. v. Rapanos* (E.D.Mich. 1995) 895 F.Supp. 165, 168, revd. on other grounds (6th Cir. 1997) 115 F.3d 367 [error to insinuate that defendant's refusal to consent to warrantless entry onto his land was evidence of concealment of a crime]; *Padgett v. State* (Alaska 1979) 590 P.2d 432, 434 [right to refuse to consent to warrantless search of car would be effectively destroyed if, when exercised, it could be used as evidence of guilt].)

Under *Keener* (which we think is correctly decided), defendant's constitutional objection should have been sustained. At that point, defendant's invocation of his Fourth Amendment right was improperly being used for the purpose of showing he had something to hide, or, in other words, demonstrating his consciousness of his guilt. (*Keener, supra,* 148 Cal.App.3d 73, 78.) In effect, the testimony punished defendant for asserting his right to have the officer obtain a warrant.

However, the error is harmless, because the evidence of defendant's refusal to admit Officer Vail would have been properly admissible during cross-examination of defendant or as rebuttal evidence following defendant's testimony.

Thus, in *Harris v. New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (*Harris*), the high court held that a statement taken without proper *Miranda* advisements is inadmissible in the prosecution's case-in-chief but may be admitted for impeachment purposes. (Accord, *People v. May* (1988) 44 Cal.3d 309, 315 [243 Cal.Rptr. 369, 748 P.2d 307].) As *Harris* explained, "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [Citations.]" (401 U.S. at p. 225 [91 S.Ct. at p. 645]; see also *Fletcher v. Weir* (1982) 455 U.S. 603, 607 [102 S.Ct. 1309, 1312, 71 L.Ed.2d 490].)

Following *Harris*'s rationale, we conclude that when defendant chose to testify, and to deny that he owned the property where the horse was located, constitutional constraints did not shield him from cross-examination as to his earlier statement refusing to admit Vail onto "my property." Defendant's

statement that Vail was "not coming on *my property*" was proper impeach-ment because it contradicted defendant's testimony that he did not have control of the property where the horse was located, which assertedly was owned by an unrelated trust. Evidence that defendant felt he had a sufficient proprietary interest in the property to refuse Vail access rebutted his claim that he had no responsibility for the property, and, inferentially, for the horse located thereon. Thus, the evidence elicited by the prosecutor in the case-in-chief would have been proper impeachment.

Admission of the foregoing evidence during the prosecution's case-in-chief, rather than for impeachment following defendant's direct testimony, was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].)

## II-V*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Morrison, J., concurred. Raye, J., concurred in the result.

A petition for a rehearing was denied December 10, 2002, and appellant's petition for review by the Supreme Court was denied January 29, 2003.

---

*See footnote, *ante*, page 803.