171 Cal.App.4th 1649 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
MARIO FLAVIO GARCIA, Defendant and Appellant.
No. C054729.
Court of Appeals of California, Third District.
February 25, 2009.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1650 Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

*1651 OPINION
CANTIL-SAKAUYE, J.
Defendant Mario Flavio Garcia appeared on a video surveillance tape leaving the Thunder Valley Casino with Christie Wilson early in the morning of October 5, 2005. They were last seen walking towards his car. Wilson was never seen again and her body was never found. A jury convicted defendant of first degree murder (Pen. Code, § 187) of Wilson and possession of a deadly weapon (Pen. Code, § 12020, subd. (a)(1)). The court found true allegations that defendant had a prior serious felony conviction (Pen. Code, §§ 667, subds. (a), (b)-(i), 1170.12, subds. (a)-(d)). Sentenced to 59 years to life in state prison (25 years to life for the murder, doubled, plus four years for the weapons charge and five years for the prior felony enhancement), defendant appeals.
Defendant contends the trial court committed numerous errors in admitting evidence and instructing the jury and the conviction for murder is not supported by the evidence. He contends the court erred in failing to suppress evidence from defendant's car and his interview with police, as well as in admitting evidence of his bad character at work, expert evidence on date rape drugs, an officer's opinions and conclusions about the case and an exhibit summarizing testimony in a timeline. Defendant contends there was instructional error as to reasonable doubt, failure to explain evidence, and third party culpability. He contends there was insufficient evidence of first degree murder under either a theory of premeditation and deliberation or felony murder based on kidnapping. He asserts the evidence is sufficient to support a conviction only for involuntary manslaughter.
We affirm. While we find it was error to use defendant's assertion of his Fourth and Fifth Amendment rights in ending the interview with the police as evidence of consciousness of guilt, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's consciousness of guilt. We reject defendant's remaining contentions. There was sufficient evidence of first degree murder on a felony-murder theory predicated on kidnapping.

FACTS
Because Christie Wilson disappeared and her body was never found, the prosecution's case against defendant for murder was based on circumstantial evidence. The prosecution sought to prove, first, that Wilson's disappearance meant that she was dead, and second, that defendant murdered her.

Christie Wilson
Christie Wilson's mother described her as driven, organized, goal oriented and a good student. Wilson had a "huge heart," was outgoing and loved *1652 animals; she tried to see the best in people. Wilson was close to her family and friends and kept in contact with them frequently by phone and e-mail. On October 4, 2005, she exchanged voice mail with her mother and sent an e-mail of her cat dressed up for Halloween to a number of family members and friends. That was the last communication they had with her.
Wilson and her sister took kickboxing classes together. Wilson knew how to defend herself and was aggressive. Wilson's stepfather was a sergeant with the San Jose police. He had warned Wilson about protecting herself in case of attack. He gave her tips on how to act if attacked, suggesting she tell an attacker that she had a venereal disease.
Wilson graduated from California State University, Chico in 2000 with a degree in production operations management. She held a number of jobs in high-tech industries, a field that did not suit her. She was terminated from some jobs and at times collected unemployment insurance.
Wilson struggled with depression after college. In June 2005, she was assessed by a psychiatrist, who diagnosed major depression, recurrent, severe. She was taking the antidepressant drug Lexapro. In September 2005, Wilson ordered a CD (compact disc) and DVD version of a self-help program for depression and anxiety.
Wilson had an off-and-on relationship with Daniel Burlando. Her mother and stepfather and some friends did not approve of the relationship. Wilson and Burlando fought; they both had stress over jobs or the lack of jobs and Wilson did not approve of how Burlando lived. In March 2005, they had a physical fight over a cell phone. Burlando called the police and both were arrested. Neither was prosecuted. Burlando had scratch marks on his torso and neck from the fight.
Wilson liked to gamble; she had met Burlando at Cache Creek Casino. She had a player's card, that tracked play and offered rewards, at Thunder Valley Casino. Wilson had a great time when she won, but lost control when she lost. She borrowed money to gamble and her gambling concerned Burlando, as well as her mother and stepfather.
By the fall of 2005, Wilson was taking steps to improve her life and her demeanor improved. She was very excited about a job prospect at Zoom Eyeworks in Berkeley, an excitement she shared with family and friends. Her first two interviews with the company had gone well and she e-mailed the vice-president about her continued interest on October 3. A third and final interview was scheduled for October 7; Wilson did not show up for the interview.

*1653 Christie Wilson's Disappearance

The evening of October 4, 2005, Burlando went to a family get-together and did not invite Wilson. When he returned home, she was not there. He invited a friend over. Around 10:30 p.m., Wilson called and said she was finishing up at Thunder Valley Casino. Burlando went to bed at 2:00 a.m. and never heard from Wilson again.
Wilson went to Thunder Valley Casino that night before 7:00 p.m. She played blackjack at various tables and met defendant at one. Around 9:30 p.m. they sat at blackjack table 36, where they stayed for about three and a half hours. They were friendly to each other. Wilson appeared happy and was drinking. She said her boyfriend had hit her that morning and pulled her hair. She raised her arm to show a bruise. Wilson talked about losing her job and getting another that would allow her to travel the world. Defendant told her he could get her a job. At one point, Wilson went to the restroom; she complained of a stomach ache and diarrhea.
Defendant bought Wilson a glass of wine and a man bought a bottle for the table. As the evening progressed, Wilson and defendant became intoxicated and loud. They were kissing and hugging and acting like boyfriend and girlfriend. Wilson was losing and she borrowed money several times from defendant; she also borrowed from another man at the table. As she lost, her demeanor changed and Wilson became angry and abusive. She called the dealer names. Her behavior became so bad that a pit boss was called, who told her to stop or she would be asked to leave. Defendant told her to calm down. Several times he tried to get her to leave, but she would not. Finally, just before the casino was prepared to throw them out, they left. As they did, the man who had lent Wilson money asked about his money. She threw chips at him and called him a name. Wilson and defendant together left the casino at 1:13 a.m., walking towards his car. Wilson was never seen again.
Video surveillance of the parking lot showed defendant and Wilson walking towards his car at 1:13 a.m. As they were out of view in the darkness, there were four flashes from a car's headlights, then two more flashes. The flashes were similar to those caused by a keyless entry system to unlock a car. Three minutes 41 seconds after the flashing, headlights in the same vicinity came on and a white car left the parking lot. A surveillance specialist from the Los Angeles Police Department enhanced the video. The enhanced video shows the white car leaving the parking lot with only one *1654 occupant, defendant, inside. The car turned right on Athens Avenue, proceeding westbound.[1] The video cameras do not show Wilson returning to her car at any time in the hour after 1:20 a.m. There was no report of a struggle or a cry for help in the parking lot that night. Security guards present that night and a deputy sheriff called for a disturbance did not notice a woman in distress.
No one at the casino that night noticed any injuries on defendant's face.
Wilson's cell phone was found under the blackjack table. No one came forward to claim it over the next few days. Eventually it was turned over to the police.

Initial Response to Wilson's Disappearance
On Wednesday, October 5, Burlando called Wilson several times, but she did not answer. He called hospitals and jails, looking for her. That night he had dinner with friends, who offered to go to the casino to look for Wilson. Burlando declined.
The next day, Burlando went to Thunder Valley Casino and found Wilson's car. He asked the casino to check her player's card and page her. He looked for her everywhere. While waiting for the pit boss, he played a little blackjack. He called Tim Nordloff, a close friend of Wilson's, who had not spoken to Wilson since earlier that week. Then he called Wilson's parents and told them he was going to file a missing person's report. After that call, Burlando called the police, as did Pat Boyd, Wilson's stepfather and a San Jose police sergeant.
Officer Mark Roddy responded to the missing person's call. He met with Burlando, who was cooperative and concerned, and searched the apartment. Burlando continued to be cooperative through the followup investigation. He allowed the police access to his apartment, computer and phone records, and gave a two-hour taped interview. Police found a stun gun in Burlando's car.
After contacting Burlando, Roddy went to Thunder Valley Casino and found Wilson's car. He also contacted the casino's surveillance supervisor. Photographs of Wilson and Burlando were sent to Thunder Valley Casino to match to surveillance tapes.
*1655 The next morning there was a neighborhood search. A BOLO (be on the lookout for) was issued to three neighboring counties. A more far-reaching APB (all points bulletin) was issued. A flier, a critical reach bulletin, was sent to other agencies. Nationwide databases of missing persons data were checked; there was no hit. Numerous additional searches, both governmental and volunteer, were conducted, some using dogs. No trace of Wilson was found.
There was no activity on Wilson's bank account after October 4. No wages were paid on Wilson's Social Security number after September. No data on Wilson appeared after October 4 on the LexisNexis person locator tool. There were no e-mails generated by Wilson after October 4, 2005, and there was no logon activity on her e-mail account. There was no activity for Wilson in DMV (Department of Motor Vehicles) records after October 5. Contacts with various police departments revealed nothing. No passport was issued in Wilson's name.

Defendant's Activities October 3-7
Defendant worked as a senior technical project manager at Sutter Health Information Technology. For several years he was assigned to an electronic "ICU" project that allowed remote monitoring of several hospitals at one central location. The week of October 3 through 7, 2005, was the kickoff of a major upgrade to the project. On Monday, defendant worked at the Mather site all day. Tuesday, October 4, he worked at the data center from 10:00 a.m. to 5:30 p.m. He sent his supervisor an e-mail at 5:25 p.m. The e-mail expressed his frustration with a coworker and said he was "having some tequila tonight." Others could tell the supervisor "that this day will live in infamy." Defendant went to Thunder Valley Casino that night.
At 7:51 a.m. the next morning, Wednesday, October 5, defendant made an outgoing call on his cell phone to his wife. The call was handled by the north sector of the Lone Star cell tower. A Sprint Nextel manager believed, based on the cell tower used, that this call was not made from defendant's residence, but rather from a location to the north.
Defendant was assigned to be at the data center Wednesday to meet and escort vendors who were making installations for the project. He was expected to be there all day, with a meeting scheduled for 9:00 a.m. One of the vendors arrived at 9:05. Defendant was not there to let him in, so the vendor called him. Defendant said he had gotten caught up in an accident and was running late. Defendant arrived shortly after 10:00. Defendant had scratches on his face and a burst blood vessel in his eye. Someone said the injuries were from a motorcycle accident. A coworker joked he hoped the *1656 other guy looked worse. Defendant explained he was working in his yard with a tractor and a branch got caught in the cage.
Defendant left work at 11:14 a.m. It was unusual for him to be late for an important meeting and to leave early. Defendant did not check in with his supervisor as he usually did. The next day defendant took sick leave. Friday he telecommuted from home, although that arrangement was not preapproved as required.
On Thursday, October 6, defendant went to the UC Davis ambulatory care center. He reported pain in his left eye, telling the doctor he fell from a 15-foot tree when the branch broke. Defendant was upset. He had blurry vision in his left eye, a swollen lower lip, and multiple abrasions to his face, torso and arms. He was treated with antibiotics for a possible skin infection and referred to an eye doctor for his eye. The nurse did not believe his injuries were consistent with a fall from a tree.
Later that day, defendant saw Dr. Barnes, a doctor of optometry. Defendant's chief complaint was blurred vision. Dr. Barnes found multiple facial abrasions, a blood blister in the eye, and a significant eye infection on the eyelid margin. He believed the blurred vision was caused by a force separate from that causing the infection. The nature of the eyelid injury was unusual to be caused by contact with a plant because of the degree of pus formation. It was hard to imagine blurred vision that could be corrected by a lens could be caused by falling out of a tree. The doctor believed the infection was caused by gram-negative bacteria. Plants are associated more with fungi than bacteria and any bacteria seen in association with soil are usually gram positive. Defendant's injuries were, however, consistent with clawing from fingernails and a punch to the eye.

Sergeant McDonald Takes Over Investigation and Interviews Defendant
After the Sacramento police found Wilson's car at Thunder Valley Casino and viewed the videotape showing her leaving, the case was passed to the Placer County Sheriff's Department. On Saturday, October 8, Sergeant Robert McDonald was briefed on the case. He obtained the videos from Thunder Valley Casino and was able to identify the man leaving with Wilson as defendant through his player's card. McDonald confirmed defendant's residence by driving by it.
The next morning, Sunday, October 9, McDonald went to defendant's residence and found him in the front yard. McDonald told him he was investigating a missing person's case and defendant had been seen in the missing person's company. Defendant was visibly nervous and looked towards the house. He said he had been at the casino and lost a large amount of *1657 money. If his wife found out, he would be in big trouble. Defendant verified that he met Wilson; he claimed they just happened to leave at the same time. On the way towards the car, Wilson realized she lost her cell phone and went back. Defendant said both he and Wilson were intoxicated. He claimed he would not have had sex with a strange woman because he feared herpes.
McDonald returned to the casino and asked that the surveillance tapes be reviewed to determine if Wilson returned to the casino for her cell phone. That afternoon, after he was told there was no sign of Wilson on the tapes, he returned to defendant's home for a more complete statement.
McDonald asked defendant to come to the office and give a statement. When McDonald asked what car defendant drove that night, defendant was reluctant to answer and asked to call a friend who was an attorney. When the attorney friend arrived, defendant pointed out the car and drove it to the station. Before defendant gave a statement, his attorney friend noted, "[l]ooks like somebody smacked you under your eye." Defendant said he had had an accident with a tractor and a tree and had poison oak on his face.
McDonald began the interview by telling defendant he was not under arrest, but under suspicion. His statement was voluntary and the door was open; defendant was free to leave and not under compulsion to do anything. Defendant stated he went to Thunder Valley Casino Tuesday after work. He met Wilson and probably flirted with her; he was pretty drunk. Wilson reported mental problems and problems with her boyfriend; she showed bruises on her arm. She was losing "big time." Defendant loaned her $50 and another man at the table loaned her $100. Wilson left the table to use the restroom or make calls; she lost her phone. They left the casino together, but Wilson was not with him. Wilson had been calling the dealer names and the pit boss was threatening to throw her out. Defendant got home at 2:00 a.m. He took Highway 65 to Interstate 80 and then went up Highway 49.
McDonald told defendant they would check the car for fingerprints, saliva, hair, skin and body fluids. He encouraged defendant to tell him everything now. McDonald wanted to take a picture of the "mouse" or small black eye that defendant had. Defendant's attorney friend said okay, but defendant refused after confirming that he was not under arrest. McDonald told him his refusal could be used against him. The interview ended. McDonald attempted to take a picture of defendant, but defendant held his hands up in front of the camera lens. Defendant then left the interview room.
The next day, Monday, October 10, a search warrant was issued for defendant's person, car and residence. It was served Tuesday; the residence was searched Thursday. Defendant was arrested Friday on a weapons charge, based on a collapsible baton found in the trunk of his car.

*1658 Defendant's Activities October 9-14

Early Sunday morning, defendant purchased a variety of anti-itch creams and laundry detergent at Longs Drugs. In addition to his interview with McDonald, defendant, who did not have regular garbage service, made a trip to the landfill to dispose of garbage. The attendant noted he looked beat-up. That night defendant took a picture of himself with a digital camera from work. He later deleted the photo but it was able to be recovered. The photo showed defendant had marks on his chin, face, forehead and neck.
On Monday, defendant worked half the day and took the other half off. He also made a return visit to the eye doctor. He told the doctor he felt much better and the abrasions on his arms were due to poison oak. Defendant sent an e-mail to work explaining he had poison oak. That night defendant did several Google searches on the computer for the term "forensics."
Tuesday defendant e-mailed a request to work remotely, claiming he had personal issues that prevented him from coming to the office. At 5:17 p.m., he went to his supervisor. She noticed welts on his forearm covered with a white lotion and that he was growing a beard. That night defendant searched the computer regarding Penal Code section 1524 on warrants.
On Wednesday defendant telecommuted to work, participating in a morning conference call. He e-mailed his supervisor explaining he had problems due to being in the wrong place at the wrong time and had retained an attorney. Defendant's telecommuting was formally approved. He returned to the medical clinic, complaining of poison oak. That day he performed several Google searches, using the term "TOXICOLOGY + VALLEY." He visited a Web page, for 23 seconds, which discussed rave/date drug screens. The Web page listed a number of rave/date drugs and indicated that urine was the preferred matrix for this toxicology panel.
Defendant worked at the data center on Thursday. The next day, Friday, he took a sick day, claiming he had medical problems and went to the hospital with chest pains. His supervisor sent an e-mail requesting that he return a work laptop computer. He responded by voice mail, saying he would. Defendant was arrested that day. When defendant was booked, he told the officer he had poison oak; he had gotten it on Sunday. As the officer prepared to note the date, defendant said he got it two weeks before.

Search of Defendant's Car
The car defendant drove to the casino October 4 was a 2004 Toyota Camry which was sold with a trunk mat and carpet. Enterprise Rent-A-Car had *1659 purchased the car used in January 2005; it was involved in an accident shortly thereafter. Enterprise sold the car to B.N., who repaired it and sold it to defendant in the summer of 2005. It was sold with a carpet in the trunk; the carpet was missing when the police searched the car. One of defendant's coworkers had seen the carpet in the trunk before.
Defendant left the car with the sheriff's department, in a secured area, the day of his interview. It was searched two days later. The car was clean and the backseat appeared to have been cleaned and vacuumed. Nonetheless, trace evidence was found implicating defendant.
A detective found a collapsible nightstick inside the trunk. This weapon was the basis of defendant's arrest for possession of a deadly weapon.
An evidence technician found a hair, identified as 1 TH, wedged in the exterior front passenger door handle. There was testimony the hair was in the catagen stage, transitioning from growing to dead, and required some force to extract from the head. DNA testing revealed the hair matched Wilson's at 15 markers. The statistical probability of a match was one in 3.2 sextillion African-Americans, one in 720 quintillion Caucasians, and one in 6.2 sextillion Hispanics.
A second search of the car was performed on October 17. A human hair consistent with Wilson's, identified as 19 TH, was found in a tape lift from the trunk area. This hair was in the anagen or active growing stage and would require force to extract from the head. The hair also had an unusual diameter variation and dramatic color change, as did the comparison hair from Wilson's hairbrush. DNA analysis matched the hair to Wilson's profile, a profile occurring once in every 720 quintillion Caucasians, 3.2 sextillion African-Americans, and 6.2 sextillion Hispanics.
Another human hair was found in a tape lift from the rear passenger floorboard. It fell within the standards of Wilson's hair. Mitochondrial DNA testing could not exclude Wilson as the source. A similar profile was found in one of 384 African-Americans and Caucasians and one in 256 Hispanics. In performing the mitochondrial testing, there were two instances where the analyst's DNA ended up in the evidence.
The car was turned over to the Department of Justice for further examination. Stains on the rear seat tested presumptively positive for blood. There were five small bloodstains. After conducting an experiment, a criminalist determined the stains were consistent with a splatter and could be caused by scratching. The splatter occurred at medium to high velocity when the car door was open. It was consistent with a single event. DNA testing revealed a *1660 mixture of two people; defendant matched at 15 loci and Wilson at eight. The DNA profile of the minor contributor occurred once in every 3,200 African-Americans, 5,800 Caucasians, and 7,900 Hispanics.
DNA testing of another cutting from the rear seat was also consistent with a mixture. Defendant's DNA profile was consistent with the major contributor, found once in 29 billion African-Americans, 300 million Caucasians, and 100 million Hispanics. Wilson could not be excluded as a minor contributor; the DNA profile occurred once in 40,000 African-Americans, 31,000 Caucasians, and 260,000 Hispanics.
A swab from the rear interior driver's side door handle was consistent with Wilson as the major contributor and defendant as the minor contributor. The probability of a random individual being the major contributor was one in 280 million African-Americans, one in 3.6 million Caucasians, and one in 5.6 million Hispanics. A swab from an interior door was consistent with Wilson as the major contributor. The DNA profile occurred once in 710,000 African-Americans, 240,000 Caucasians, and 30,000 Hispanics.[2]

Search of Defendant's Residence
When the police searched defendant's residence, they asked defendant about the clothes he wore to the casino. He said his wife probably took them to the cleaners. When the police asked defendant's wife, she pointed out some clothes draped over exercise equipment in the bedroom. The last visit to the cleaners was a dropoff on October 3 and a pickup on October 6.
On the kitchen table were printouts of Evidence Code sections 911 through 919, concerning privileges, and State Bar Special Master Rules and Penal Code sections 1524 through 1524.3, concerning warrants. There were chips from Thunder Valley Casino in a dresser drawer.

Expert Testimony
An arborist testified there was a broken willow branch on defendant's property. He believed it had fallen due to wind and rain. On his first trip he found no poison oak; on a second trip he found poison oak near some oak trees, but no broken branch from which a person could have fallen.
Dr. Connie Mitchell, an emergency room physician, testified about defendant's injuries and disputed that they were the result of falling from a tree. She *1661 found the injuries consistent with a struggle and scratching in close quarters. A corneal abrasion was more common in an assaultive encounter than an accident. She believed the parallel pattern of abrasions was more likely caused by fingernails than a tree branch. Defendant's injuries were consistent with blunt force trauma and grabbing of soft tissue. He had a classic claw injury. Bruises on his arm were suggestive of a bite mark, not falling from a tree. The lack of injuries to defendant's back and the few on his legs were more consistent with a fight than falling.
A dermatologist testified poison oak is an allergic dermatitis, characterized by red lesions with blistering. It generally appears 18 to 48 hours after exposure. If defendant was exposed Sunday, October 2, he should have had symptoms and itching by Wednesday, October 5, but the medical records from that date did not suggest poison oak. The doctor believed the abrasions on defendant's face were not poison oak; it is not associated with bruising.
Over defense objection, Detective Don Murchison testified that based on the witnesses' description of Wilson at the casino, Wilson exhibited symptoms consistent with consuming the date rape drug. Those symptoms were slow or slurred speech, upset stomach, diarrhea, amnesia, impaired motor skills and a sleepy appearance. The drug was usually put in a fruity drink, such as wine, to mask its taste. The videotape did not show anyone dropping anything in Wilson's drink.

The Defense
Defendant testified he did not kill, murder, rape or kidnap Wilson. He maintained he had nothing to do with her disappearance. He denied fighting with Wilson. Defendant was certain she was never in his car and he could not explain the presence of her hair or DNA in his car. It was part of his normal routine to wash his car and go to the dump. He claimed there was never a carpet or rug in his trunk and the baton was part of his son's martial arts gear. His injuries were due to a fall from a willow tree.
William Pence was in Folsom on October 5 and saw a woman. She asked if he knew where Thunder Valley Casino was. She explained she had had too much to drink the night before and left her car in the parking lot. She was trying to get back. When he told her the casino was 20 to 30 miles away, she said she would walk. When the police showed Pence a photographic lineup, he could not identify Wilson as the woman he saw. He thought she was wearing a sundress and perhaps sandals. After he heard about Wilson's disappearance on the radio, he saw a picture of her on the Internet and was 70 to 75 percent sure she was the woman he saw.

*1662 DISCUSSION

I.

Motion to Suppress[*]

II.

It Was Error to Use Defendant's Assertion of Fourth and Fifth Amendment Rights As Evidence of Guilt, but the Error Was Harmless Beyond a Reasonable Doubt
During his interview of defendant on October 9, Sergeant McDonald asked defendant to walk him through the point where he left Wilson. Defendant asked why that was important and McDonald responded it was very important. McDonald reminded defendant they had his car and admonished defendant to tell him everything because the police were going to search his car for trace evidence. Defendant told his friend Pat Little he needed a criminal attorney because there were too many questions and "this is going far too deep." McDonald said he could not ask any more questions, but wanted to take a picture of defendant. Defendant refused, got up and left the interview.
The prosecution used this evidence as consciousness of guilt. In closing argument, the prosecutor focused on the interview and argued defendant was suppressing evidence. The prosecutor argued defendant buttoned up his shirt at the beginning of the interview; "what is he covering up?" The argument continued: "Holding his hands in front of the camera. Is this cooperation? If he had nothing to hide, why not just let him take some pictures? And then he leaves. Are these the actions of an innocent man?"
Defendant contends the trial court erred in admitting into evidence his refusal to permit Sergeant McDonald to take his picture and his leaving the interview room. This evidence came in through McDonald's testimony, a redacted videotape of the interview, and several stills from the videotape showing defendant putting his hands out to block the taking of a picture.
Defendant contends the admission of this evidence violated both his Fourth and Fifth Amendment rights. He contends his refusal to be photographed was an assertion of his Fourth Amendment right not to be seized or detained for the picture taking. Defendant contends that although he was not in custody, *1663 and thus had no rights under Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (Miranda), the context makes clear he was relying on his Fifth Amendment rights in terminating the interview. Recognizing that his trial counsel objected only on Fifth Amendment grounds, he contends he has not forfeited the Fourth Amendment contention. He notes the prosecution initially framed the issue in terms of the Fifth and Sixth Amendments, and he contends the defense simply followed the prosecution's lead. He asserts the issue is the same whether raised under the Fourth, Fifth or Sixth Amendmentwhether a defendant's assertion of rights can be used against him. Finally, if this court finds forfeiture due to failure to raise the contention expressly in the trial court, defendant contends he was denied effective assistance of counsel. Defendant argues this evidence of consciousness of guilt played an important role in the circumstantial evidence case, so its erroneous admission was not harmless.

Proceedings in the Trial Court
Before trial, the People filed a trial brief on the admissibility of various statements by defendant. The People sought to introduce defendant's statements to McDonald on October 9, except his request for an attorney. The People claimed there was no issue under Miranda because defendant was not under arrest; the only significant issue was his request for counsel. The defense initially responded that the interrogation was involuntary because it was coerced by McDonald's threat to seize all of defendant's cars. Further, defendant had asserted his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel.
At the hearing on the admissibility of defendant's statements, the defense argued admitting evidence of defendant's refusal to be photographed "flies in the face" of his rights to leave, retain counsel and remain silent. The People argued taking a picture was nontestimonial and did not implicate Miranda rights. The defense argued defendant's actions in ending the interview must be considered together; his refusal was tied to his request for an attorney and the right to remain silent. Both the Fifth and Sixth Amendments were implicated. The defense urged that defendant's assertion of the right to counsel and to remain silent was an assertion of constitutional rights, not evidence of a consciousness of guilt. The trial court ruled evidence of defendant's refusal to be photographed was admissible.

Analysis
(1) We agree with trial counsel that when defendant ended the interview, he was asserting various constitutional rights: to not be detained, to not incriminate himself, and to have the assistance of counsel. In requesting a *1664 photograph, McDonald was attempting to obtain physical evidence from defendant. "[T]he obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levelsthe `seizure' of the `person' necessary to bring him into contact with government agents [citation], and the subsequent search for and seizure of the evidence." (United States v. Dionisio (1973) 410 U.S. 1, 8 [35 L.Ed.2d 67, 76, 93 S.Ct. 764].) Here the second level is not a Fourth Amendment violation because taking a picture of someone is not a search. (U.S. v. Emmett (7th Cir. 2003) 321 F.3d 669, 672.) "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (Katz v. United States (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507].) (2) Defendant was not seized and brought into contact with the police; he voluntarily accompanied them to the interview. When he ended the interview, however, he withdrew his consent to the voluntary detention; at that point he asserted his Fourth Amendment rights.[3] The invocation of Fourth Amendment rights cannot be used to show guilt. (People v. Wood (2002) 103 Cal.App.4th 803, 809 [127 Cal.Rptr.2d 132]; People v. Keener (1983) 148 Cal.App.3d 73, 78-79 [195 Cal.Rptr. 733].)
(3) Whether a defendant has invoked his right to remain silent is to be determined from the facts and circumstances. (People v. Musselwhite (1998) 17 Cal.4th 1216, 1238 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Here defendant stopped the interview once the questioning turned to "the most important part of everything." McDonald was asking defendant about his actions in leaving the casino with Wilson; as defendant was already under suspicion, his answers could be incriminating. Defendant understood this as he told Little the questions were getting "too deep" and he needed a criminal attorney. These circumstances "`lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment.'" (People v. Riel (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969] [silence may not be used as adoptive admission if reliance on Fifth Amendment].)
(4) The United States Supreme Court has not considered whether prearrest silence is protected by the Fifth Amendment. (Jenkins v. Anderson (1980) 447 U.S. 231, 236, fn. 2 [65 L.Ed.2d 86, 93, 100 S.Ct. 2124].) There is a split of authority among the circuit courts. Focusing on the fact that the defendant was not in custody, the Fifth, Ninth and Eleventh Circuits have held it is permissible to comment on the defendant's prearrest silence. (U.S. v. Zanabria (5th Cir. 1996) 74 F.3d 590, 593; U.S. v. Oplinger (9th Cir. 1998) 150 F.3d *1665 1061, 1066-1067; U.S. v. Rivera (11th Cir. 1991) 944 F.2d 1563, 1567-1568.) The Attorney General urges us to follow these cases. Defendant contends the decisions of circuit courts that have held the use of prearrest silence as substantive evidence of a defendant's guilt violates the Fifth Amendment are better reasoned. (Combs v. Coyle (6th Cir. 2000) 205 F.3d 269, 283; U.S. v. Burson (10th Cir. 1991) 952 F.2d 1196, 1201; Coppola v. Powell (1st Cir. 1989) 878 F.2d 1562, 1568; U.S. ex rel. Savory v. Lane (7th Cir. 1987) 832 F.2d 1011, 1017.) These cases rely on three Fifth Amendment principles: (1) the invocation of the privilege must be given a broad and liberal construction; (2) the invocation of the privilege requires no special words; and (3) the privilege can be asserted by a suspect during an investigation. (U.S. v. Burson, supra, at p. 1200.) "In a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution; the privilege should thus apply." (Combs v. Coyle, supra, at p. 283.) We find the reasoning of these cases more persuasive. Because defendant was exercising his Fourth and Fifth Amendment rights in terminating the interview, the trial court erred in admitting into evidence that defendant ended the interview and left.
Under Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824], a violation of a criminal defendant's federal constitutional rights requires reversal of the judgment unless the reviewing court determines "beyond a reasonable doubt that the error complained of did not contribute to the verdict." Applying that standard, we find the error in admitting evidence of defendant's refusal to be photographed and termination of the interview was harmless beyond a reasonable doubt.
Certainly evidence that defendant stopped cooperating with the police once the questioning turned to the critical area that could incriminate him was powerful evidence of consciousness of guilt and evidence of consciousness of guilt was especially important in a circumstantial evidence case. In this case, however, there was overwhelming evidence of defendant's consciousness of guilt; almost all of his actions after Wilson's disappearance showed a consciousness of guilt. Defendant had suspicious injuries for which he offered differing explanations. He was growing a beard, perhaps to hide his injuries. His attendance at work was erratic despite the critical stage of his important project. He was extremely nervous when McDonald first contacted him. He took an alternate route home from the casino, but failed to tell the police about it. He was reluctant to point out the car he drove that night. When asked about the clothes he wore that night, he immediately said they were at the cleaners. He made a series of Google searches relating to forensics, date rape drugs and privileges. This evidence, combined with the medical evidence contradicting defendant's explanations of his injuries, and the forensic evidence that placed Wilson in the backseat and trunk of his car and indicated *1666 a violent struggle, was considerable evidence of defendant's guilt. The addition of his refusal to be photographed and to continue the interview added little to the prosecution's case.

III.-XII.[*]

DISPOSITION
The judgment is affirmed.
Blease, Acting P. J., and Robie, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I. and III. through XII.
[1] Sergeant McDonald testified that one leaving the casino and going to Highway 65, as defendant said he did, would turn left on Athens Avenue. Turning right on Athens takes one to Fiddyment Road, where Athens dead ends. From Fiddyment Road one can go to Lincoln and Highway 193. It is about the same distance to Interstate 80 by either Highway 65 or Highway 193.
[2] The senior criminalist who performed the DNA analysis testified to a case of contamination. He performed analysis on cuttings from a shirt seized from defendant's bedroom. One of the cuttings contained the criminalist's DNA.
[*] See footnote, ante, page 1649.
[3] We recognize that this contention was not made as clearly to the trial court. Trial counsel focused on defendant's refusal to be photographed and did not mention the Fourth Amendment. Given trial counsel's argument that defendant was asserting his right to leaveand since on appeal defendant contends any failure to adequately preserve the issue is ineffective assistance of counselwe address the merits without considering forfeiture.
[*] See footnote, ante, page 1649.