Filed 9/29/21  P. v. Purewal
Received for posting on 9/30/21.  Opinion after vacating opinion filed on 5/27/21.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C079406 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F05261) |
| v. | |
| RAJDEV SINGH PUREWAL, | |
| Defendant and Appellant. | |

Defendant Rajdev Singh Purewal and a codefendant, Sarbjit Singh Sandu,[1] were jointly tried before separate juries and each found guilty of one count of kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1)—count 1),[2] seven counts of forcible oral copulation in concert (former § 288a, subd. (d)—counts 2, 5, 8, 11, 14, 17, & 20),[3] six

---

[1] Sandu is not a party to this appeal.

[2] Undesignated statutory references are to the Penal Code.

[3] This offense has been renumbered and now constitutes a violation of section 287, subdivision (d)(1).

1

counts of forcible sodomy in concert (§ 286, subd. (d)—counts 3, 6, 9, 12, 15, & 18), and six counts of forcible rape in concert (§ 264.1—counts 4, 7, 10, 13, 16, & 19). (*People v. Sandhu* (Oct. 1, 2019, C079402 [nonpub. opn.].) With respect to counts 2 through 20, the jury also found true that defendant and Sandhu kidnapped the victim (§ 667.61, subds. (d)(2) & (e)(1)), acted in concert (§ 667.61, subds. (d)(5) and (e)(7)), and tied or bound the victim (§ 667.61, subd. (e)(5)). The trial court sentenced defendant to 482 years to life; seven years to life for count 1, and consecutive terms of 25 years to life for counts 2 through 20.

Defendant appeals, arguing: (1) the trial court erred in admitting evidence that he was reluctant to provide a DNA sample to police and allowing the prosecutor to rely on that evidence to show consciousness of guilt; (2) the trial court gave the jury impermissibly one-sided instructions for evaluating his postcrime conduct; (3) the trial court erred in admitting evidence that he and Sandhu considered stealing or borrowing a license plate one week before the kidnapping; (4) the trial court's instructions on oral copulation in concert and sodomy in concert conflicted with the instructions on aiding and abetting on the issue of intent, violating his right to due process; and (5) section 209, subdivision (d) required the trial court to stay his sentence of seven years to life for count 1. We will modify the judgment to stay the sentence on count 1. In all other respects, the judgment is affirmed.

## I. BACKGROUND

### A. The Crimes

Victim Jane Doe drove home from her part-time job on the evening of January 24, 2012. (*People v. Sandhu, supra,* C079402.) She pulled into her driveway around 9:00 p.m. (*Ibid.*) As she was gathering her things, a man opened the driver's side rear door and got into the backseat. (*Ibid.*) He placed what she thought was a gun to her head and ordered her to drive. (*Ibid.*) The man told Doe she would not get hurt if she cooperated. (*Ibid.*) Doe did as she was told.

2

The man instructed Doe to pull over after a minute or so. (*People v. Sandhu, supra,* C079402.) He ordered her to put up her hands and then bound them with zip ties. (*Ibid.*) He then pushed her into the back seat and blindfolded her with a black covering secured with duct tape. (*Ibid.*) The man also covered Doe's mouth with duct tape.[4] (*Ibid.*)

The man got into the driver's seat and started driving. (*People v. Sandhu, supra,* C079402.) After 10 minutes, the man stopped the car and got into the back seat with Doe. (*Ibid.*) A second man got into the car and started driving. (*Ibid.*) The man in the backseat made Doe drink two liquids: one that tasted like NyQuil and another that tasted like vodka. (*Ibid.*) The car came to a stop after approximately 40 minutes of driving. (*Ibid.*) Doe was carried into a building of some kind and ordered to walk up a flight of carpeted stairs. (*Ibid.*) She was then pushed onto a bed. (*Ibid.*)

The man with the gun ordered Doe to remove her clothes. (*People v. Sandhu, supra,* C079402.) The man cut Doe's zip ties so she could undress and then zip tied her hands again. (*Ibid.*) The man with the gun then left the room. (*Ibid.*) Another man entered the room sometime later. He spoke with a voice that was somehow disguised to sound robotic. (*Ibid.*) He ordered Doe to suck his penis, and she did so, against her will (count 2). (*Ibid.*) The man with the robotic voice made Doe orally copulate him two more times (counts 5 & 8), inserted his penis into her anus multiple times (counts 3, 6, & 9), and inserted his penis into her vagina (count 4). (*Ibid.*) He then left the room. (*Ibid.*)

The man with the gun reentered the room. (*People v. Sandhu, supra,* C079402.) He made Doe orally copulate him four times (counts 11, 14, 17, & 20), and inserted his penis into her anus (counts 12 & 15) and vagina (counts 7, 10, & 13) multiple times. (*Ibid.*) The man with the gun then left the room, and the man with the robotic voice

---

[4] Doe remained blindfolded throughout her hours-long ordeal. (*People v. Sandhu, supra,* C079402.) The duct tape was removed from her mouth at some point. (*Ibid.*)

returned.  (*Ibid.*)  The man with the robotic voice then put his penis in Does' mouth, anus (count 18), and vagina (counts 16 & 19).  (*Ibid.*)

When they were done, the man with the gun helped Doe into her clothes and escorted her to her car.  (*People v. Sandhu, supra,* C079402.)  He sat beside Doe in the back seat and forced her to copulate him as the other man drove.  He then made her drink more of the liquid that tasted like NyQuil.  (*Ibid.*)  The car came to a stop after approximately 40 minutes.  (*Ibid.*)  The driver left the car.  The man with the gun removed Doe's blindfold and zip ties and told her that her phone, which had been taken from her, was in the cupholder and she could find her way home.  (*Ibid.*)  He warned her that she would get hurt if she told anyone what happened.  He then got out of the car and walked away.

Doe called her boyfriend, who called 911.  (*People v. Sandhu, supra,* C079402.)  She then drove herself home.  She reached home shortly after 2:00 a.m.  (*Ibid.*)  Police officers arrived around 20 minutes later.  (*Ibid.*)  An officer took photographs of Doe and observed red marks on her wrists and duct tape in her hair.  (*Ibid.*)

*B.      The Investigation*

Dr. Angela Rosas, a pediatrician specializing in child abuse and adult sexual assault, completed a sexual assault forensic examination on Doe in the predawn hours of January 25, 2012.  Doe reported that her wrists hurt, and she was experiencing pain in her vagina and anus.  Doe told Dr. Rosas that she believed one of the perpetrators had worn a condom.

Dr. Rosas observed abrasions on Doe's wrists, fresh bruises on her knees, and duct tape in her hair.  Dr. Rosas also observed genital abrasions consistent with sexual contact.  Dr. Rosas could not say, however, whether the contact was consensual or nonconsensual.  Dr. Rosas collected swabs from Doe's breasts, the right side of her neck, the area outside her mouth, and her vagina, cervix, and rectum.  Dr. Rosas also collected samples of Doe's urine and blood.

4

Doe was interviewed by City of Sacramento Police Detective Terri Castiglia later that same morning. During the course of the interview, Castiglia asked Doe for permission to search her phone and computer, which Doe gave. Doe also provided access to her email and Facebook accounts. At the end of the interview, Doe showed Castiglia the route she had been ordered to drive by the man with the gun. Police later returned to the area and found a zip tie on the ground. Police also searched Doe's car and found zip ties on the front passenger seat, the back seat, and the back floorboards. (*People v. Sandhu, supra,* C079402.) Police found a toy gun on the front passenger's seat underneath Doe's book bag. (*Ibid.*) The toy had been painted to look real.

Castiglia interviewed Doe a second time on January 31, 2012. The interview was precipitated by Doe after she discovered a new email account on her phone. The account, which was created on the night of the kidnapping, had been used to send photographs from Doe's phone to an unfamiliar yahoo.com email address. The photographs were intimate self-portraits, which Doe had taken before the kidnapping to share with her boyfriend.

During the second interview, Doe disclosed that she suspected Sandhu may have been one of the perpetrators. Sandhu was her cousin's boyfriend, and Doe had visited his apartment in Yuba City on two occasions, both times as part of a group. Sandhu had previously expressed a romantic interest in Doe; an interest she did not reciprocate. Although Doe had exchanged a few text messages with Sandhu years before, nothing came of the correspondence. Doe had not communicated with Sandhu by text or email in the year preceding the kidnapping and had not sent photographs of herself to him. Nevertheless, she suspected him because he was the only person she knew who lived 30 minutes away and had his own apartment with carpeted stairs. Doe did not know defendant and had never communicated with him by phone, text, or email.

Castiglia obtained a search warrant for Sandhu's apartment in Yuba City. The search uncovered black zip ties in a nightstand in an upstairs bedroom, bottles of NyQuil

5

in a kitchen cabinet, and a bag containing vinyl gloves and duct tape. The search also uncovered several cell phones.

Castiglia interviewed Sandhu and then placed him under arrest. Castiglia obtained a DNA sample from Sandhu, which was compared with DNA extracted from the cervical, vaginal, and rectal swabs collected from Doe, and found to match. DNA analysis also indicated the presence of another contributor, confirming Doe's account of having been assaulted by two men.

Castiglia set out to determine the identity of the second man. She contacted Sandhu's girlfriend, who provided the names of Sandhu's close friends and family members. Defendant, who is Sandhu's cousin, was among the men so identified. Castiglia began contacting the men on the list. Each of them agreed to provide a DNA sample and was soon eliminated as a suspect. Defendant was another story.

Castiglia went to defendant's home in Davis, but he was not home. She left a business card. Defendant called Castiglia later that day or the next day. Castiglia requested a meeting. Defendant, a college student, explained that he was busy with midterms. Nevertheless, he agreed to a meeting.

The time for the meeting came and went, but defendant was a no show. He called Castiglia afterwards and explained that he forgot the appointment. Castiglia recorded the call, which would later be played for the jury. During the call, defendant stated he was generally aware of the circumstances surrounding Sandhu's arrest from articles he had read online, but he was otherwise unfamiliar with the case and was not especially close to his cousin. Castiglia explained that she was collecting DNA samples from Sandhu's close friends and family members in an attempt to identify a second suspect. She asked whether defendant would be willing to provide a sample, and he demurred, stating, "I don't know how comfortable I am with that idea." Defendant explained that he had spent time at Sandhu's apartment in Yuba City and expressed concern that DNA testing might place him at the scene of the crime. Castiglia responded that the sample would not be

6

compared to anything found in Sandhu's apartment. She went on to explain that defendant was one of several men she was contacting and collecting samples from.

Defendant then said that he was not familiar with the process for collecting DNA and would like some time to research it. Castiglia offered to explain the process, and then proceeded to do so. She concluded her explanation by saying defendant's sample would be compared to one police already had from a second suspect and then destroyed, assuming there was no match. The following exchange then took place:

"[DEFENDANT]:   So basically it's—it's like— if a— if a person you're asking like doesn't voluntarily do that he's kind of considered a suspect if— if.

"[CASTIGLIA]:   Well I'm— I mean I understand your concern.

"[DEFENDANT]:   Uh-huh.

"[CASTIGLIA]:   But yes, I mean, I would— the thing is if you haven't done anything wrong . . .

"[DEFENDANT]:   Mm-hm.

"[CASTIGLIA]:   . . . there's nothing to fear is my thing."

The conversation continued along these lines for a brief period. The following exchange then took place:

"[DEFENDANT]:   Um, so you guys have been doing DNA tests so, um, I don't know if I'm allowed to ask this, but didn't my, uh, cousin get arrested on the grounds of—of DNA evidence or—or?

"[CASTIGLIA]:   Yeah.

"[DEFENDANT]:   Oh, wow.

"[CASTIGLIA]:   Yes he did. And—and the thing is that I've gone to plenty of other people and they've, um, been more than willing to give up . . .

"[DEFENDANT]:   Mm-hm.

"[CASTIGLIA]:   . . . a DNA sample.

"[DEFENDANT]:   Yeah.

7

"[CASTIGLIA]:     So because, you know, when you explain the whole circumstances and if you know, truly in your heart there's nothing you've done wrong.

"[DEFENDANT]:   Mm-hm.

"[CASTIGLIA]:     Then there's really no reason to . . .

"[DEFENDANT]:   Mm-hm.

"[CASTIGLIA]:      . . . to worry about it so.

"[DEFENDANT]:   Yeah.

"[CASTIGLIA]:     I mean I've—I've contacted other family members of [Sandhu's] and gotten samples.  I've contacted his friends and gotten samples.  So.

"[DEFENDANT]:   Mm-hm.

"[CASTIGLIA]:     I mean it would—it concerns me that—that maybe you're not wanting to give me a sample because maybe there's something else that's going on.

"[DEFENDANT]:   Oh, no—no—no, nothing like that.  It's—it's—it's just the idea of—of—of giving a— a DNA sample is just—is scary to me.  I mean, I don't know, but I mean bas—like, you know what I mean, from what you're telling me it—it does make me feel a little bit more comfortable and everything and—and, um, like I said, yeah, uh, I mean I didn't do anything wrong so I mean I shouldn't have anything to worry about and so, yeah I mean, I guess sometime next week maybe."

Defendant and Castiglia discussed possible times for a meeting, with Castiglia offering to come to Davis the next day and defendant pushing for the following week. They ultimately agreed to meet on the following Monday morning, five days from the date of the call.  Defendant did not appear for that meeting either.  Just before the scheduled meeting time, defendant called Castiglia and said that he was not comfortable meeting.  He indicated that he still did not understand the process for collecting DNA and wanted to conduct further research.  He also indicated that a roommate's family member had passed away, and he needed to help his roommate.  Castiglia offered to come to

8

Davis right away, but defendant said he was not available. He offered to contact Castiglia when he became available, but he never did.

In the meantime, police were examining the phones recovered from Sandhu's apartment. They found that one of Sandhu's phones had been used to search for the beauty supply store where Doe worked. The same phone contained a video of a woman with her eyes covered with duct tape and her hands tied behind her back with black zip ties.[5] Another phone contained photographs of Doe that appeared to have been taken on the night she was kidnapped. Police also found a treasure trove of text messages between Sandhu and defendant.

Sandhu searched for Doe's beauty supply store on January 13, 2012.[6] Three days later, on January 16, 2012, Sandhu sent a text message to defendant asking, "U up?" Defendant responded, "Yeah." Sandhu then asked, "RU down to do that on Wednesday?" Defendant responded, "Yes." Sandhu then wrote, "She gets off at nine. Gonna B to [*sic*] late then." Defendant responded, again, "Yes."

On January 17, 2012, Sandhu sent defendant a text message stating, "We need a license plate." Defendant responded, "Get Polly's?" Sandhu replied, "His car's not there." Sandhu then wrote, "Jack Gurdevs"; an apparent reference to stealing a license plate from someone named Gurdev. Defendant responded, "I can. Will be able to put

---

[5] The video has not been made part of the record on appeal; however, defendant's opening brief characterizes the content of the video as "Ms. Doe being sodomized by someone wearing a latex glove."

[6] A screenshot reflecting the name and address of Doe's store was also later found on defendant's phone.

'em back on. N it's nuggets. LOL." Sandhu responded, "LOL, K, cool, yeah, we could put it back on."**7**

On January 19, 2012, defendant sent Sandhu a text message asking, "Guns still drying?" On January 24, 2012 (the day of the kidnapping), at approximately 2:30 a.m., defendant sent a text message to Sandhu stating, "Cymbalta is for depression, and it's delayed release, but one of the side effects is tiredness. Cellebrex [*sic*] is an arthritis pain reliever, but fuck those, get some NyQuil and we set." Sandhu responded, "LOL, K, cool." Defendant wrote, "Aite night," and Sandhu replied, "We can buy it tomorrow aite, night."

That evening, at approximately 7:00 p.m., Sandhu sent defendant a text message stating, "About to leave. Can you buy the stuff?" An hour later, Sandhu sent defendant a text message stating, "LOL, cherry?" Defendant responded, "Original is better." Sandhu replied, "K." A short time later, defendant sent Sandhu a text message asking, "Where are you at?" Sandhu responded, "By u." Defendant replied, "K." Moments later, defendant wrote, "Fuck. They taking forever, it's been ten min." Sandhu responded, "Go ask them. B like WTF?" Defendant replied at 8:30 p.m., "They only have two people worken [*sic*]."

On the evening of January 25, 2012, after the kidnapping, Sandhu sent a text to defendant asking, "Did you find the toy?" As noted, police found a toy gun on the front passenger's seat of Doe's car.

Castiglia returned to Davis, armed with search and arrest warrants. A search of defendant's house uncovered a bottle of NyQuil in a shared bathroom but little else. Defendant waived his *Miranda*[8] rights and told Castiglia, again, that he had no firsthand

---

**7** As discussed in greater detail *post*, there was no evidence that defendant or Sandhu followed through on the scheme to borrow or steal a license plate.

**8** *United States v. Miranda* (1966) 384 U.S. 436 (*Miranda*).

knowledge of the circumstances giving rise to Sandhu's arrest. Castiglia obtained a DNA sample from defendant at the time of his arrest. Subsequent DNA analysis confirmed that defendant's sample matched DNA extracted from the swabs collected from Doe's neck and breast.

C.      *The Trial*

Sandhu and defendant were tried together before two juries in April 2015. Defendant's jury heard evidence over the course of eight days. The prosecution's witnesses testified substantially as described *ante*. The jury also heard the evidence described *post*.

During the course of the combined trial, jurors were informed by stipulation that blood and urine samples collected from Doe after the kidnapping had been analyzed by the Sacramento County Crime Lab and found to be negative for alcohol, but positive for doxylamine. Criminalist Michael Toms testified that doxylamine is an antihistamine commonly found in cold and flu preparations, including NyQuil. Presented with a hypothetical involving a person forced to consume the same quantities of alcohol and NyQuil as Doe, at the same times, Toms opined that he would not expect to see alcohol in blood or urine collected from the person the next morning.

Detective Eugene Shim, an expert in cell phone and computer forensics, testified that he analyzed Doe's phone, and he found no contacts for Sandhu or defendant and no evidence of incoming or outgoing calls or text messages to or from either one. Shim testified that an email account bearing Doe's name had been created on January 24, 2012, at 9:49 p.m., and used to send photographs to the unfamiliar yahoo.com email account shortly thereafter. Shim further testified that the newly created email account had not been used again, while the email address for the unfamiliar yahoo.com email account had been found on Sandhu's computer.

The jury also heard that an incriminating note had been found outside defendant's jail cell while awaiting trial in this case. The note was addressed to defendant's

11

girlfriend, N.B. The note instructed N.B. to hack into Doe's email and Facebook accounts and offered detailed instructions on how this might be done. Once N.B. had hacked her way into Doe's Facebook account, she was to send defendant a message, posing as Doe, in which she would offer to recant her statements to police in exchange for money. Thus, if N.B. were successful in hacking into Doe's accounts, defendant would receive a message, ostensibly from Doe, stating, "I will tell the detective I lied and that we had consensual sex . . . [¶] . . . but [i]f you want my help, I need $25,000." The note further instructed N.B. to call Doe and offer as much as $35,000 in exchange for her recanting her sexual assault allegations.

Defendant did not testify or present any witnesses. However, defense counsel extensively cross-examined Doe, and sought to undermine her credibility with evidence that she fought with her boyfriend in the weeks leading up to the kidnapping and, upon learning that he had attempted to initiate suggestive conversations with her coworkers, sent him a text message stating, "Fuck you. I can hide shit too, you fucking slut." Defense counsel also elicited evidence that Doe downloaded Pinger, an application that allows users to send messages and place phone calls from different phone numbers. Doe testified that she used Pinger only once, to "mess with" her boyfriend.

Defense counsel also attempted to undermine Doe's credibility with evidence that she told Castiglia she "always" deleted intimate photographs from her phone, but failed to delete the photographs that had been emailed to the unfamiliar yahoo.com email account, and evidence that she had not warned her cousin, Sandhu's girlfriend, that she suspected Sandhu may have been one of the perpetrators.

D.      *Closing Arguments*

The jury heard closing argument over the course of two days. The prosecutor's closing argument framed the case as a credibility contest between Doe and defendant on the question of consent. The prosecutor emphasized defendant's changing story, noting that he initially told Castiglia he had no information concerning the circumstances

12

surrounding Sandhu's arrest, and only later proffered a consent defense, upon learning of the existence of DNA evidence against him. The prosecutor reminded the jury that several suspects had been contacted during the investigation and all agreed to provide DNA samples except for defendant.

The prosecutor theorized that defendant had been the man with the gun and Sandhu the man with the robotic voice, as Sandhu would have wanted to avoid being recognized by Doe, with whom he was acquainted. The prosecutor argued there was no evidence of consent, but extensive evidence that Sandhu and defendant plotted to kidnap and sexually assault Doe, including physical evidence (such as the toy gun, duct tape, and zip ties) and electronic evidence (such as the photographs, video, and text messages). The prosecutor emphasized that there was no evidence of phone calls, text messages, or other communications between Doe, on one hand, and Sandhu or defendant, on the other, and no evidence that Doe communicated with Sandhu or defendant using Pinger.

Defense counsel agreed that the case boiled down to a credibility contest between Doe and defendant. However, defense counsel found ample reason to question Doe's credibility. Defense counsel observed that Dr. Rosa's sexual assault forensic examination had been inconclusive as to whether the contact with Doe had been consensual or nonconsensual. Defense counsel further observed there was no evidence of alcohol in Doe's blood or urine and no biological or other evidence that defendant had ever been in Doe's car. Defense counsel suggested that Doe had participated in a consensual ménage à trois with defendant and Sandhu, using Pinger to cover her tracks. Defense counsel reminded the jury that Doe sent her boyfriend an angry text in the period preceding the kidnapping, warning that, "I can hide shit, too." Defense counsel theorized that Doe "set this whole thing up" in a bid for sympathy from her boyfriend.

Defense counsel observed that some people use NyQuil recreationally, adding that the text messages between Sandhu and defendant were not necessarily inconsistent with an eagerly anticipated consensual encounter. Defense counsel acknowledged that

13

defendant had been reluctant to provide a DNA sample but argued that defendant was merely confused and dismayed at a consensual encounter gone badly wrong. Defense counsel noted that defendant's conduct after being contacted by police demonstrated a "consciousness of innocence," as defendant continued his college studies and made no attempt to flee the country or destroy evidence. As for the jailhouse note, defense counsel argued that defendant was merely frustrated at being locked up. In summary, defense counsel concluded, defendant "was forced to live a nightmare when all of a sudden a consensual sexual encounter turned into some nightmare of forced kidnapping and forced sexual assault; it never happened."

### E. Deliberations and Verdict

The jury retired for deliberations on Thursday, April 23, 2015, at 2:02 p.m. A little more than an hour later, the trial court received a jury note requesting the testimony of Doe and Castiglia, the zip ties found on the ground and in Doe's car, and the toy gun. The trial court also received a jury note requesting "DNA evidence (all)." The trial court released the jury for the day a short time later.

Deliberations resumed on Friday, April 24, 2015. The trial court arranged for the zip ties and toy gun to be sent to the jury deliberation room and asked whether jurors wanted all of Castiglia's lengthy testimony read back, or just a portion. The trial court also sought clarification of the jury's request for "DNA evidence (all)." The jury responded with a third note a short time later. The third note requested a read back of Doe's testimony "from the point where she describes what happened on January 24, 2012 from being taken in her driveway to the point she was returned and released (back in [her community] in her car)." The court reporter went into the jury deliberation room and read back the requested testimony.[9] That afternoon, at 3:23 p.m., the trial court received

---

[9] The clerk's minutes do not reveal whether any portion of Castiglia's testimony was read back.

14

a fourth jury note stating, "We are at an impasse, we believe we are a hung jury, what are your further instructions?" The trial court released the jury for the weekend with instructions to return on Monday.

The jury returned for further deliberations on Monday, April 27, 2015. At noon, the trial court received a fifth jury note requesting the videotape of the interview of defendant following his arrest, the testimony of the officer who responded to the 911 call on January 25, 2012, and a copy of a PowerPoint presentation summarizing the DNA evidence. The videotape and PowerPoint presentation were provided, and the testimony was read back. Towards the end of the day, the trial court received a sixth jury note requesting copies of the texts between Sandhu and defendant and confirmation of the date of the recorded telephone call between defendant and Castiglia. The jury was released for the day a short time later.

The jury returned for another day of deliberations on Tuesday, April 28, 2015. The text messages and date of the recorded telephone call (October 12, 2012) were provided. At 11:58 a.m., the trial court received a seventh jury note, stating "After review instructions #220, we would like further explanations as to the differences between reasonable doubt and possible doubt, and how those differences should impact our decisions. Can you give us examples of reasonable doubt and possible doubt?" The jury also requested a copy of the video from Sandhu's phone. A short time later, the trial court sent a response, encouraging the jury to reread CALCRIM No. 220 and indicating that a copy of the video had been provided. Later that day, the trial court received an eighth jury note, requesting clarification of the findings required by CALCRIM No. 3182. The jury was released for the day a short time later.

The jury returned for further deliberations on Wednesday, April 29, 2015. Around noon, the trial court received a ninth jury note, requesting a read back of "Doe's testimony where she is describing the different sexual acts, the various positions she was

15

in, and the order of the act." [10]  The trial court responded to the jury's previous note, and the jury adjourned for the day.[11]

The jury returned for further deliberations on Thursday, April 30, 2015.  Around noon, the trial court received word that a verdict had been reached.  As noted, the jury found defendant guilty as charged.  The jury was polled, and all jurors affirmed the verdicts.  Nearly a month later, on May 26, 2015, one of the jurors called the trial court to say that "she now feels that she did not make the right decision in convicting Mr. Purewal."

## F.    *Sentencing*

Defendant appeared for sentencing on May 29, 2015.  The trial court sentenced defendant to seven years to life for the aggravated kidnapping charged in count 1 (§ 209, subd. (b)(1)), and consecutive terms of 25 years to life for each of the offenses charged in counts 2 through 20.

Defendant filed a timely notice of appeal.

## II.  DISCUSSION

### A.    *Evidence of Defendant's Reluctance to Provide DNA Sample*

Defendant contends the trial court erred in admitting evidence of his reluctance to provide a DNA sample and allowing the prosecutor to rely on that evidence in closing argument.  The People concede the error, but argue it was harmless beyond a reasonable doubt.  We agree with the People.

---

[10]  The clerk's minutes identify the ninth jury note as "Request No. 7," but this appears to have been an error.

[11]  The clerk's minutes do not indicate whether or when the jury received the read back requested by the ninth jury note.

### 1.  Additional Background

Prior to trial, defendant filed a motion in limine to exclude evidence that he failed to cooperate with Detective Castiglia after his name was brought to her attention.  The motion referred to defendant's reluctance to provide a DNA sample and sought to exclude all evidence of his failure to cooperate.  The trial court denied the motion pursuant to Evidence Code section 352.

During the trial, the prosecutor presented evidence that Castiglia contacted five male suspects in the course of her investigation, not counting defendant and Sandhu.[12] For each suspect, the prosecutor elicited testimony that Castiglia contacted the suspect, requested and collected a voluntary DNA sample, and eventually eliminated him as a suspect.

Later, the prosecutor questioned Castiglia about her attempts to schedule a meeting with defendant.  The prosecutor played the recording of the Castiglia's telephone conversation with defendant (summarized *ante*), and then asked a series of follow-up questions.  As relevant here, the prosecutor briefly questioned Castiglia about her offer to come to Davis to collect defendant's DNA sample, stating, "And when you offered to come right then to get—to take the DNA test, what did he say?"  Castiglia responded, "He wasn't available to do that."  The prosecutor's direct examination then moved on to other matters.

Defense counsel returned to the subject of collecting a DNA sample on cross-examination of Castiglia.  Defense counsel posed a series of questions confirming the substance of Castiglia's recorded conversation with defendant, and then elicited her agreement that she was not in a position to compel defendant to provide a DNA sample at

---

[12]  Some of these suspects had been identified by Sandhu's girlfriend.

the time of the call, and his unwillingness to provide a sample did not mean he was guilty of anything.

Defendant's reluctance to provide a DNA sample came up again in closing argument. The prosecutor reminded the jury that Castiglia contacted several suspects, all of whom agreed to provide DNA samples. The prosecutor continued: "Detective Castiglia detailed out for you about these attempted meetings with Mr. Purewal. He doesn't want any part of it. He doesn't want to give a DNA sample. You heard him say, hey, can I ask you a question? If I don't want to provide a DNA sample, am I a suspect? Am I automatically a suspect? And, hey can I ask you another question? How did you catch my cousin? Wasn't it DNA evidence? Oh, it was. Wow. That's his response: Wow. I don't think I want to give a DNA sample. [¶] That's what he said. And he doesn't. He won't meet with the detectives. He will not provide a DNA sample."

The prosecutor continued to recount the investigative steps that led Castiglia to defendant. She described some of the text messages found on Sandhu's phone, and then stated: "Mr. Purewal, after the discovery of those text messages and the photos—this is after he's refused to meet with the detective, he's refused to provide a DNA sample— after those text messages and photos, that was enough for the arrest and search warrant for Mr. Purewal. He's located and he's followed in the city of Davis. He's arrested by detectives. And the DNA sample is taken from him." The prosecutor then concluded her argument without making further mention of defendant's reluctance to provide a DNA sample.

### 2.    *Analysis*

Defendant argues the trial court committed constitutional error in admitting evidence that he refused to provide a DNA sample and allowing the prosecutor to rely on that implicit assertion of Fourth Amendment rights to show consciousness of guilt. The People concede the error, and we accept the concession. (*People v. Wood* (2002) 103 Cal.App.4th 803, 807-810 [trial court erred in allowing animal control officer to testify,

18

over defendant's objection, that defendant refused officer's request to enter property without a warrant]; *People v. Keener* (1983) 148 Cal.App.3d 73, 78-79 [trial court erred in admitting evidence of defendant's refusal to consent to warrantless entry into his residence]; see also *Griffin v. California* (1965) 380 U.S. 609, 614 [error for the prosecutor to comment on the defendant's exercise of his Fifth Amendment right not to testify at trial].) Having done so, we can turn directly to the question of prejudice.

We review federal constitutional errors—including violations of the privilege to be free from comment upon the assertion of a constitutional right—under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Wood, supra,* 103 Cal.App.4th at p. 810 [applying *Chapman* standard to erroneous admission of statement invoking Fourth Amendment right against warrantless search].) Under *Chapman*, we "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831.) "To find the error harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on the issue in question." (*People v. Song* (2004) 124 Cal.App.4th 973, 984.)

The error here was harmless beyond a reasonable doubt. Defendant's reluctance to provide a DNA sample was memorialized in the recording of his telephone conversation with Castiglia, which was admitted to show consciousness of guilt. But the telephone conversation showed consciousness of guilt in several ways, some of which were distinct from defendant's constitutionally protected assertion of Fourth Amendment rights. During the course of the conversation, defendant offered excuses for missing an earlier appointment with Castiglia and reasons why he could not commit to a new meeting time. He also led Castiglia to believe that he was not close to Sandhu and had no firsthand knowledge of the circumstances surrounding his cousin's arrest. These evasions and untruths, which are not said to have been improperly admitted, conveyed

19

the same information as the improperly admitted evidence that defendant was reluctant to provide a DNA sample. That defendant refused to cooperate with the police investigation, for example, was conveyed by the properly admitted evidence that he failed to appear for appointments with Castiglia. Likewise, that defendant had cause to be concerned about DNA evidence, and changed his story to account for the presence of his DNA on swabs collected from Doe, was conveyed by properly admitted evidence that he offered one version of events to Castiglia and another, very different version at trial, after lawfully obtained DNA established that he had been in contact with Doe. The improperly admitted evidence that defendant was reluctant to provide a DNA sample was thus cumulative of properly admitted evidence on the issue of consciousness of guilt. And there was more such evidence, quite apart from the incriminating telephone conversation with Castiglia.

As previously discussed, the jury also heard evidence that Sandhu and defendant were searching for the toy gun the day after the kidnapping, an exercise that would likely have been unnecessary had the toy gun been used as a mere prop in consensual role playing. More damning, the jury heard evidence that defendant wanted his girlfriend to hack into Doe's email and Facebook accounts to compose phony messages exonerating him. Against this properly admitted evidence, the admittedly improper evidence that defendant was reluctant to provide a DNA sample, and the prosecutor's equally improper comment on that evidence, can only be viewed as nonessential. We therefore conclude that the evidence concerning defendant's reluctance to provide a DNA sample, and the prosecutor's comment on that evidence, did not contribute to the verdict and was unimportant in relation to everything else the jury considered on the issue of consciousness of guilt, as revealed in the record. (*People v. Song, supra,* 124 Cal.App.4th at p. 984.)

*People v. Schindler* (1980) 114 Cal.App.3d 178 (*Schindler*), on which defendant relies, does not convince us otherwise. There, the defendant shot and killed her husband

and was tried for second degree murder. (*Id.* at p. 181.) The defense presented "extensive evidence" that the defendant was suffering from diminished capacity and acted in self-defense. (*Ibid.*) Among other things, the defense introduced evidence that the defendant was afraid of her husband, who had shot and killed a previous wife. (*Ibid.*) The evidence was undisputed that the defendant killed her husband, but a defense psychiatrist testified she did so in a "state of panic" brought about by the husband's threat to kill her. (*Id.* at p. 182.) The prosecutor, in an attempt to rebut the defendant's diminished capacity defense, elicited evidence that she exercised her *Miranda* rights in an interview shortly after the shooting, and requested, as her attorney, the man who prosecuted her husband for the murder of his first wife. (*Id.* at pp. 182-185.) The prosecutor commented on this evidence in closing argument, arguing that the defendant's assertion of rights showed she was not suffering from diminished capacity. (*Id.* at pp. 184-186.)

The defendant was convicted, and the court of appeal reversed. (*Schindler, supra,* 114 Cal.App.3d at pp. 181, 191.) The court found: "The prosecution not only impermissibly introduced evidence concerning [the] defendant's exercise of her right [to remain silent] but also affirmatively used this evidence in argument to convey the impression that her defense of a 'panic state' was fabricated." (*Id.* at p. 186.) The court further found that the prosecution impermissibly used the defendant's "choice of defense attorney to impeach her and rebut her defense of diminished capacity." (*Id.* at p. 187.) The court concluded the errors were prejudicial, explaining: "The only issue at trial was [the] defendant's intent and mental capacity at the time of the commission of the offense. The defense evidence was substantial. The rebuttal evidence directly attacked her defense, and the prosecutor's argument that the evidence showed she was fabricating her 'panic' state was most prejudicial." (*Id.* at p. 190.)

*Schindler* is distinguishable. There, the prosecutor's improper evidence and argument struck at the heart of the defendant's theory that she was suffering from

21

diminished capacity when she shot and killed her husband. (*Schindler, supra,* 114 Cal.App.3d at p. 190.) That theory was not only supported by "substantial" defense evidence, it was also "[t]he only issue at trial." (*Ibid.*) Here, by contrast, there was no evidence that Doe consented to anything that happened that night. Although Doe's consent may have been the only issue at trial, her consent could have been manifested in any number of ways (unlike the defendant's state of mind in *Schindler*), and the evidence that defendant was reluctant to provide a DNA sample was only a small piece of a much larger body of evidence showing consciousness of guilt. As we have discussed, the improper evidence was cumulative of properly admitted evidence on the same issue, which was not the case in *Schindler*. Furthermore, the inculpatory significance of the evidence, in the context of all the other evidence received by the jury, was not that defendant invoked his Fourth Amendment rights, but that he went from denying firsthand knowledge of the crimes against Doe in conversation with Castiglia to asserting an inconsistent defense at trial; namely, that she participated in a consensual sexual encounter with him. On the record before us, we conclude that the erroneous admission of evidence showing that defendant was reluctant to provide a DNA sample, and the prosecutor's impermissible comment on that evidence, were harmless beyond a reasonable doubt.

Defendant resists this conclusion, pointing to the jury's lengthy deliberations.[13] Our Supreme Court has "sometimes inferred from unduly lengthy deliberations that the question of guilt was close." (*People v. Cooper* (1991) 53 Cal.3d 771, 837.) But there

_____

[13] Defendant also points to the fact that one of the jurors expressed regret about the verdict weeks later. However, jurors were polled the day they returned their verdict and all affirmed the verdict in open court. We cannot infer anything about the jury's deliberations or the closeness of the case from the fact that a juror had second thoughts after the fact. (*People v. Steele* (2002) 27 Cal.4th 1230, 1262 ["Not all thoughts 'by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such [thoughts] cannot impeach a unanimous verdict; a jury verdict is not so fragile' "].)

was nothing to support such an inference in this case. Jurors heard eight days of testimony from 20 witnesses. They were presented with hundreds of exhibits and numerous stipulations, many of them dealing with complex scientific and electronic evidence. Jurors were confronted with 20 counts, 19 of which required additional findings for each of five special allegations. (§ 667.61, subds. (d)(2), (d)(6), (e)(1), (e)(5), and (e)(7).) They were also required to parse Doe's hours-long ordeal into discrete offenses and determine which were committed by defendant and which by Sandhu. Under the circumstances, it should come as no surprise that jurors requested multiple readbacks and items of evidence, and even faced an impasse on the second day of deliberations. But the jury continued to deliberate, and ultimately reached a verdict four days later. On the record before us, we cannot say that the jury's deliberation over the course of six days (only four of which were full days) supports a conclusion that the case was close. Given the number and complexity of the counts, and the complicating presence of a co-defendant, the jury's lengthy deliberations "could as easily be reconciled with [its] conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*People v. Walker* (1995) 31 Cal.App.4th 432, 438-439 [declining to infer any difficulty in reaching a decision from length of deliberations where jury deliberated for six and one half hours following a two and one half hour long trial]; *People v. Houston* (2005) 130 Cal.App.4th 279, 301 [concluding that four days of jury deliberations suggested "diligence" rather than a close case where the trial involved "over three dozen witnesses occurring on 10 different days spread over three weeks, as well as lengthy closing arguments and jury instructions spread over two additional days"].)

That the jury sought clarification of the reasonable doubt standard does not convince us that the error was prejudicial. The jury requested an explanation of the difference between reasonable doubt and possible doubt on the fourth day of deliberations. The trial court directed the jury to reread CALCRIM No. 220, and the jury continued to deliberate. The jury then quickly sent another note, seeking clarification of

23

another instruction (CALCRIM No. 3182). While such requests could suggest a close case (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295), they are just as likely to suggest that jurors were carefully working their way through the instructions and asking questions as they arose. But even assuming the case was close (an assumption undermined by the consistency of the verdict), we would still find that the error was harmless beyond a reasonable doubt. Given the strength of the prosecution's case, the weakness of the defense (which posited that Doe consented to rough sex with a stranger to garner sympathy from her boyfriend), and the cumulative nature of the improper evidence, we perceive no reasonable possibility that the verdict would have been more favorable to defendant had the evidence been excluded. We therefore reject the claim of error.

B.      *Instructions on Postcrime Conduct*

Defendant next challenges the trial court's instructions on postcrime conduct: CALCRIM No. 362 (false statements), CALCRIM No. 371 (suppression or fabrication of evidence), and CALCRIM No. 372 (flight).[14] He argues that some or all of these

---

[14] The jury was instructed with CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

The jury was instructed with CALCRIM No. 371 as follows: "If the defendant tries to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

24

instructions violated his right to due process by informing the jury that evidence of his postcrime conduct could be used to convict, without also explaining that such evidence could be used to acquit. Specifically, he argues jurors should have been instructed that evidence he cooperated with police by speaking with Castiglia, and evidence he remained in Davis rather than fleeing the country, could support an acquittal.[15] We are not persuaded.

None of the instructions told jurors that defendant's postcrime conduct could only be considered to support a finding of guilt. Rather, the instructions informed jurors that certain types of conduct could demonstrate consciousness of guilt. Each of the challenged instructions directed jurors to first determine whether the postcrime conduct occurred, and then determine the significance of that conduct. If, for example, jurors determined that defendant did not make false statements to Castiglia, they would have no reason to apply CALCRIM No. 362. Likewise, if jurors determined that defendant did not attempt to create false evidence or flee, they would have no occasion to apply CALCRIM No. 371 or CALCRIM No. 372. Nothing in the instructions barred jurors from considering defendant's other postcrime conduct. Defendant was thus free to argue that his willingness to speak with Castiglia and decision to remain in Davis were evidence of innocence.

---

The jury was instructed with CALCRIM No. 372 as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

[15] Although defendant purports to challenge CALCRIM No. 371, he does not explain how evidence that he wanted N.B. to hack into Doe's email and Facebook accounts might have supported an acquittal.

Furthermore, the instructions plainly informed jurors that they could not rely on evidence of defendant's postcrime conduct as the sole basis for finding guilt. As our Supreme Court has explained, these instructions "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.] We therefore conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [discussing CALJIC versions of CALCRIM Nos. 361, 371, and 372]; see also *People v. Famalaro* (2011) 52 Cal.4th 1, 35 [consciousness of guilt instruction did not violate federal constitutional rights to due process or a fair trial]; *People v. Jurado* (2006) 38 Cal.4th 72, 125 [consciousness of guilt instructions were not impermissibly argumentative or misleading, and did not permit the jury to draw irrational inferences].)

Defendant directs our attention to *Cool v. United States* (1972) 409 U.S. 100 (*Cool*), which, he says, "controls this case." There, the defense relied almost exclusively on the testimony of the defendant's alleged accomplice, which was completely exculpatory in nature. (*Id.* at p. 101.) The trial court instructed the jury on accomplice testimony, in relevant part, as follows: " 'I charge you that the testimony of an accomplice is competent evidence and it is for you to pass upon the credibility thereof. If the testimony carries conviction and you are convinced it is true *beyond a reasonable doubt,* the jury should give it the same effect as you would to a witness not in any respect implicated in the alleged crime and you are not only justified, but it is your duty, not to throw this testimony out because it comes from a tainted source." (*Id.* at p. 102.)

The United States Supreme Court concluded the instruction on accomplice testimony was flawed in two respects. (*Cool, supra,* 409 U.S. at p. 102.) First, the court explained that "there is an essential difference between instructing a jury on the care with which it should scrutinize certain evidence in determining how much weight to accord it and instructing a jury, as the judge did here, that as a predicate to the consideration of certain evidence, it must find it true beyond a reasonable doubt." (*Id.* at p. 104.) Such an instruction, the court said, "impermissibly obstructs the exercise of [the right to present accomplice testimony] by totally excluding relevant evidence unless the jury makes a preliminary determination that it is extremely reliable." (*Ibid.*) Furthermore, the court found, "the instruction . . . has the effect of substantially reducing the Government's burden of proof." (*Ibid.*)

None of these deficiencies are present in the instructions here. As we have discussed, the instructions did not tell jurors they could convict on the basis of postcrime conduct alone. Rather, they told jurors that evidence of false statements, attempts to create false evidence, and flight *may* show consciousness of guilt, but do not, by themselves, prove guilt. (CALCRIM Nos. 361, 371, and 372.) As such, defendant's analogy to *Cool* is inapt. (See *People v. Peterson* (2020) 10 Cal.5th 409, 456 [distinguishing *Cool* where, as here, challenged instruction could not be said to have "put a thumb on the scale of the jury's deliberations by informing them they could return a guilty verdict based entirely on one piece of the prosecution's evidence"].) We therefore reject the claim of instructional error.

*C.*     *Admission of License Plate Evidence*

Defendant next argues the trial court erred in admitting, over defense objection, a series of text messages suggesting that defendant and Sandhu contemplated stealing or borrowing a license plate a week before the kidnapping. [16] We perceive no error.

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence is relevant if it has some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.) A trial court has broad discretion in determining the relevance of evidence. (*Id.* at pp. 1166-1167.)

Even relevant evidence may be excluded if its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review for abuse of discretion a trial court's ruling to admit or exclude relevant evidence under Evidence Code section 352. (*People v. Hamilton* (2009) 45 Cal.4th 863, 929-930.) An abuse of discretion is "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 195.)

Defendant argues the text messages were irrelevant and inflammatory. He emphasizes that there was no evidence anyone actually followed through on a plan to

---

[16] As noted *ante*, the series began with a text message from Sandhu to defendant stating, "We need a license plate." Defendant responded, "Get Polly's?" Sandhu replied, "His car's not there." Sandhu then wrote, "Jack Gurdevs." Defendant responded, "I can. Will be able to put 'em back on. N it's nuggets. LOL." Sandhu replied, "LOL, K, cool, yeah, we could put it back on."

28

borrow or steal a license plate and claims that any connection between the text messages and charged crimes was speculative.  We disagree.

The evidence showed that Sandhu searched for Doe's place of employment on January 13, 2012.  Sandhu exchanged one series of text messages with defendant on January 16, 2012, confirming that defendant was "down" to do something on Wednesday, noting that, "She gets off at nine."  Sandhu and defendant exchanged the challenged text messages on January 17, 2012, discussing the possibility of stealing or borrowing a license plate.  Defendant sent Sandhu a text message inquiring whether the guns were "still drying" on January 19, 2012.  Defendant and Sandhu exchanged additional text messages on the day of the kidnapping, covering such topics as NyQuil, the side effects of other medications, and their impatience with some sort delay.  The evidence thus showed that Sandhu and defendant discussed the possibility of stealing a license plate around the time they were researching Doe's place of employment, painting a toy gun, and considering the side effects of various medications.

The substance and timing of the challenged text messages, considered in the context of the other communications between Sandhu and defendant in the period preceding the charged crimes, raised a reasonable inference that Sandhu and defendant considered kidnapping Doe in a car disguised with stolen plates, and thus had a tendency in reason to show planning.  Evidence that Sandhu and defendant were planning a kidnapping in a car disguised with stolen plates was relevant and admissible to show that they committed a kidnapping, albeit in a different car, one week later.  (*People v. Case* (2018) 5 Cal.5th 1, 39-40 [evidence that the defendant was planning to commit one robbery was relevant and admissible to show that he later committed another robbery]; see also *People v. Balcom* (1994) 7 Cal.4th 414, 424 ["Evidence that the defendant possessed a plan to commit the type of crime with which he or she is charged is relevant to prove the defendant employed that plan and committed the charged offense"].)  That Sandhu and defendant may have changed their planning with respect to the car used to

29

carry Doe away does not render evidence of their original plan irrelevant or inadmissible. On the record before us, the trial court could reasonably conclude that the challenged messages were relevant to show planning to commit the charged crimes and were nowhere near as inflammatory as the crimes themselves. We therefore find no abuse of discretion in the admission of this evidence. And because there was no abuse of discretion, there was no violation of defendant's right to due process and a fair trial. (*People v. Panah* (2005) 35 Cal.4th 395, 482, fn. 31; *People v. Benavides* (2005) 35 Cal.4th 69, 95.)

D.      *"In Concert" Instructions*

Defendant next challenges the trial court's instructions on oral copulation in concert (counts 2, 5, 8, 11, 14, 17, & 20) and sodomy in concert (counts 3, 6, 9, 12, 15, & 18). He argues the trial court's in concert instructions (CALCRIM Nos. 1016 and 1031) conflicted with the court's instructions on aiding and abetting (CALCRIM Nos. 400 and 401). He notes the in concert instructions define oral copulation and sodomy as general intent offenses, while the aiding and abetting instruction requires a specific intent to assist the perpetrator. He argues the supposed conflict on the issue of intent allowed jurors to find him guilty of oral copulation and sodomy in concert without finding that he intended to aid and abet Sandhu in the commission of the crimes, and thus violated his right to due process. Defendant's argument lacks merit.

The trial court instructed the jury on aiding and abetting with CALCRIM Nos. 400 and 401 as follows: "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.) "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] (1) The perpetrator committed

30

the crime; [¶] (2) The defendant knew that the perpetrator intended to commit the crime; [¶] (3) Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] (4) The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids* and *abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor." (CALCRIM No. 401.)

The trial court instructed the jury on oral copulation in concert with CALCRIM No. 1016, which provides, in part, as follows: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] (1) The defendant personally committed oral copulation and voluntarily acted with someone else who aided and abetted its commission; [¶] OR [¶] (2) The defendant voluntarily aided and abetted someone else who personally committed oral copulation." The trial court instructed the jury on sodomy in concert with CALCRIM No. 1031, which tracks CALCRIM No. 1016.

The trial court's in concert instructions thus provided two ways defendant could be found guilty: He could either be found to have personally committed the offense and voluntarily acted with someone else who aided and abetted its commission, or he could be found to have voluntarily aided and abetted someone else who personally committed the offense. (CALCRIM Nos. 1016 and 1031.) Defendant appears to focus on the second way he could have been found guilty of an in concert sexual offense, through aiding and abetting. To find guilt under an aiding and abetting theory, the jury would

31

have been required to find that defendant voluntarily aided and abetted Sandhu, who personally committed oral copulation or sodomy.[17]

Reading the instructions as a whole, as we must, we are satisfied that a reasonable jury would have had no difficulty discerning the requisite intent for finding guilt for an in concert offense under an aiding and abetting theory. (*People v. Wilson* (2008) 44 Cal.4th 758, 803-804.) Each of the challenged in concert instructions referred the jury back to the aiding and abetting instructions, which made clear that to find that defendant aided and abetted in the commission of a crime, the jury had to find beyond a reasonable doubt that he had the intent to aid and abet the perpetrator in committing the crime: "Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime." (CALCRIM No. 401; see also CALCRIM Nos. 1016 and 1031.) In order to find defendant guilty of an in concert offense under an aiding and abetting theory, the jury would have had to find that he a specific intent to encourage, facilitate, or instigate Sandhu's commission of the offense. (CALCRIM No. 401.) Contrary to defendant's contention, therefore, the jury could not have found him guilty of an in-concert offense on an aiding and abetting theory unless jurors found that

---

[17] To find defendant guilty under the first theory, the jury would have been required to find that he personally committed oral copulation or sodomy (both general intent crimes) *and* that he voluntarily acted with Sandhu who aided and abetted its commission. The in concert instructions refer the jury to the aiding and abetting instructions, which make clear that it must be proven beyond a reasonable doubt that "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime." (CALCRIM No. 401; see also CALCRIM Nos. 1016 and 1031.) To find defendant guilty under this theory, then, the jury would have had to conclude that defendant committed the sexual offense and that Sandhu had the specific intent to aid and abet him. Defendant's argument that he could have been found guilty of an in concert sexual offense without having the requisite specific intent to aid and abet does not appear to apply to this basis for criminal liability, for under this theory, defendant would have been aided and abetted by Sandhu, rather than defendant aiding and abetting him.

32

he had the specific intent to encourage, facilitate, or instigate Sandhu as the perpetrator of the offense.

The trial court correctly instructed the jury that to find defendant guilty for oral copulation and sodomy in concert, the prosecution was required to prove that defendant either personally committed the offense while voluntarily acting with someone else (Sandhu) who aided and abetted its commission, or that defendant specifically intended to encourage, facilitate, or instigate Sandhu's commission of the offense. These instructions properly informed the jury of the intent required for the in concert sexual offenses. (See *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 496-497.) We therefore reject defendant's claim of instructional error.

E.      *Sentence for Aggravated Kidnapping*

Finally, defendant argues his sentence of seven years to life for aggravated kidnapping to commit rape (§ 209, subd. (b)(1)—count 1) should have been stayed pursuant to section 209, subdivision (d), which prohibits punishment for the same act (here, kidnapping) that constitutes a violation of both section 209, subdivision (b) and section 667.61. (§ 209, subd. (d).) The People concede the issue, and we accept the concession. (See *People v. Adams* (2018) 28 Cal.App.5th 170, 192-194 [sentence for aggravated kidnapping must be stayed based on section 667.61, subdivision (d)(2) qualifying circumstances].)

33

## III.  DISPOSITION

The judgment is modified to stay the sentence on count 1.  As so modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

/S/

RENNER, J.

We concur:

/S/

BLEASE, Acting P. J.

/S/

HOCH, J.